## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| IVAN J. RIOS-GRAJALES, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. 24-297-BAH |
| PAMELA J. BONDI, | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Ivan Rios-Grajales ("Plaintiff") brought suit against Attorney General Pamela Bondi ("Defendant")[1] alleging racial and age discrimination in the course of his employment with the Drug Enforcement Administration ("DEA"). ECF 19 (amended complaint). Pending before the Court is Defendant's motion to dismiss. ECF 23. Plaintiff filed an opposition, ECF 34, and Defendant filed a reply, ECF 44. Plaintiff, with Defendant's consent, entered a supplement to his response at ECF 36. All filings include memoranda of law and ECFs 23 and 36 exhibits.[2] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, Defendant's motion is **GRANTED** in part and **DENIED** in part.

---

[1] As Defendant acknowledges, the only proper defendant in a Title VII action is "the head of the department, agency, or unit" 42 U.S.C. § 2000e-16(c). And upon the departure of a public officer sued in their official capacity, "[t]he officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d). When Plaintiff initiated suit on January 29, 2024, the serving Attorney General was Merrick B. Garland, who was replaced as Attorney General by Pamela J. Bondi in February 2025.

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

## I.    **BACKGROUND**

The facts alleged here arise out of the course of Plaintiff's employment with the DEA. Plaintiff, a Latino man of Puerto Rican nationality, served as a Supervisory Criminal Investigator and Supervisory Special Agent ("SSA") until he retired from the DEA in June 2021. ECF 19, at 2 ¶ 6. In 2008, Plaintiff was assigned to the DEA's Washington Division Office ("WDO"), which has offices in both Washington, D.C. and Baltimore, Maryland. *Id.* at 3 ¶ 11.

In 2015, the WDO established a Special Response Team ("SRT"), a specialized tactical unit composed of SSAs, Special Agents ("SAs"), and Task Force Officers ("TFOs"). ECF 19, at 3 ¶ 12. The SRT's primary function was to execute "high-risk arrest and search warrants involving dangerous targets." *Id.* Plaintiff notes that participation in the SRT was voluntary but considered prestigious within the DEA, offering opportunities for skill development and potential professional recognition. *Id.* He indicates that he considered his involvement in the SRT "to be prestigious and integral to his standing within the DEA, as well as important for developing and maintaining his tactical skills and decision-making prowess." *Id.*

Plaintiff was an original member of the SRT and served on the team in multiple capacities, including as a coordinator for the execution of warrants, a training coordinator, and an SRT instructor at various times from 2015 to 2018. ECF 19, at 4 ¶ 14. The initial SRT leadership team consisted of Assistant Special Agent in Charge ("ASAC") Kevin Carter and Co-Team Leaders Jeff Cundith, Robert Grob, and Mark Mutha, all SSAs. *Id.* Plaintiff notes that all four men were "White" and "Caucasian" and that Carter, Cundith, and Murtha were all older than Plaintiff while Grob was younger.[3] *Id.* On the SRT, Plaintiff also worked with SA Nestor Laserna, "a White,

---

[3] There appears to be some discrepancy in Plaintiffs' amended complaint as to the relative ages of Carter and Cundith: he says first that Carter and Cundith are older than he is, *see* ECF 19, at 4 ¶ 13, but in the next paragraph appears to describe them as being younger, *see id.* ¶ 14.

Hispanic male originally from Colombia who was about the same age as Plaintiff"; SA Mark Lester, "a White, Caucasian male from the United States who was younger than Plaintiff"; and SA Terrance Reaves, "a Black, African-American male from the United States who was younger than Plaintiff." *Id.*

From 2016 to 2018, Plaintiff alleges he was subjected to multiple instances where SAs Lester and Laserna mocked Plaintiff's "Puerto Rican/Spanish accent in front of other SRT members." ECF 19, at 5 ¶ 17. Other witnesses, including SAs Heath Anderson, Andrew Fleury, and Steven Barbakoff, also described instances where Laserna or Lester mocked Plaintiff's accent in from of other members of the team. *Id.* Fleury also reported seeing another SA shoot Plaintiff "in the groin with a [non-lethal] simunition round" during a training exercise, possibly intentionally, and laugh about it afterwards with Laserna. *Id.* at 6 ¶ 18.

In July 2016, during a firearms training session, Lester allegedly "referred to Plaintiff as a 'Puerto Rican douchebag' in front of SRT members" and told Plaintiff he should have notified other instructors before beginning to shoot at the range. ECF 19, at 6 ¶ 21. Plaintiff followed up with Lester the next day over email, describing the remark as "unprofessional and discriminatory." *Id.* Lester responded and apologized, claiming it was a joke and asking to "move forward in friendship." *Id.* at 6–7 ¶ 22.

Later in 2016, Grob made decisions excluding Plaintiff from certain SRT activities, including prohibiting him from participating in SRT panel interviews and replacing him in meetings without providing a rationale for doing so. ECF 19, at 7 ¶¶ 22–23. Plaintiff notes that his replacements in these tasks were "less experienced." *Id.* Though Plaintiff emailed Grob on both occasions registering his objection, Grob never responded to either message. *Id.*

3

In March 2018, Plaintiff was promoted to the position of SSA, at the GS-14 level, in the Baltimore office. ECF 19, at 7 ¶ 26. He became the first Puerto Rican SSA on the SRT and "one of only two Hispanic/Latino individuals" out of a total of seventeen team members. *Id.* at 8 ¶ 28. Plaintiff also notes that he was the oldest member of the team, at 49 years of age. *Id.* Plaintiff anticipated that his promotion to SSA would, consistent with past SRT practice, result in a leadership role, such as a Co-Team Leader, though no such appointment occurred. *Id.* at 9–10 ¶¶ 30–33.

On April 16, 2018, Grob, who had become the SRT Team Leader, went on leave and designated Laserna as the Team Leader during Grob's absence. ECF 19, at 12 ¶ 38. Plaintiff was "embarrassed" and "humiliated" by this delegation, as he was a GS-14 while Laserna was a GS-13. *Id.* Later that day, "Plaintiff wrote to [] Grob," copying Carter and another high-ranking agent, "stating that for operations outside of his group [], he would be the point of contact for all SRT matters and would serve as the supervisor on the scene for any SRT operation," citing in support a provision of DEA manuals. *Id.* Plaintiff then followed up with Laserna and Reaves to ask for a copy of the SRT's operational plan but never received a response. *Id.*

Two days later, Plaintiff cancelled the WDO SRT team's participation in a warrant execution "because [] Laserna and [] Reaves refused to send him the SRT's operational plan, which made it impossible for Plaintiff to ensure the safety of the operation, comply with the DEA Agent's Manual, and adhere to the 2018 SRT Manual's operational and safety requirements." ECF 19, at 13 ¶ 39. Plaintiff contacted the United States Marshals Special Operations Group and requested they conduct the warrant execution instead. *Id.* Plaintiff describes this as common practice between federal agencies and notes that the operation was successful and never resulted in any disciplinary action." *Id.* ¶ 40.

4

However, following this incident, Grob instructed Laserna to remove Plaintiff's access to SRT's communication channels and database and proposed Plaintiff's permanent removal from the team. ECF 19, at 14 ¶ 41. On April 24, 2018, Plaintiff met with ASAC Don Hibbert, Plaintiff's first-line supervisor, "to request that [Plaintiff] step away from the WDO SRT in order to focus full time on his new GS role." *Id.* ¶ 42. Hibbert represented that this was a temporary measure and that Plaintiff could return after six months. *Id.* Plaintiff communicated as much to different SRT members. *Id.* ¶ 42. During this same conversation with Hibbert, Plaintiff also reported the incidents where Lester and Laserna had mocked his accent and where Lester had referred to him as a "Puerto Rican douchebag." *Id.* ¶ 41.

On May 23, 2018, Grob emailed Plaintiff, copying both Carter and Hibbert, to allege that Plaintiff's canceling of the SRT's participation in the April 18 warrant execution jeopardized agent safety and undermined the mission. ECF 19, at 15 ¶ 46. Grob also asserted that Plaintiff's actions "would have resulted in Plaintiff's removal had he not stepped down, and barred his reinstatement to the SRT." *Id.* Plaintiff characterizes both of these assertions as false. *Id.* Shortly thereafter, Plaintiff gave a presentation during a meeting at the Assistant U.S. Attorney's Office, for which he was not given "any guidance in advance" as to the nature of the remarks. *Id.* at 16 ¶ 48. Though Plaintiff says he was given "no negative feedback about his remarks at the time," Hibbert later testified that "Plaintiff's separation from the SRT was due in part to how some of his remarks at the June 12, 2018 meeting were allegedly not well received." *Id.*

After six months away from the SRT, in the fall of 2018, Plaintiff contacted Hibbert and Carter for permission to return to the SRT. ECF 19, at 16 ¶ 50. However, his request was denied due to "DEA mission essential functions." *Id.* Around the same time, Plaintiff went on leave and requested his primary group (the "SFG1" group), to ensure he was consulted on "any decisions

concerning SFG1 operations requiring SRT teams[.]" *Id.* at 17 ¶ 51. However, upon returning from leave, Plaintiff discovered that Lester had assigned both teams to execute a search warrant without consulting Plaintiff, "resulting in a lack of coordination." *Id.* The same month, Plaintiff requested a voluntary lateral transfer from the Baltimore office to the Washington, D.C. office, citing the "substantial reduction of his daily commute . . . , enhancements to his quality of life and performance as a supervisor, and fuel savings for the Agency" as his rationales. *Id.* ¶ 52. Plaintiff's request was denied. *Id.* Plaintiff made the same transfer request six more times and each time it was denied. *See id.* at 18 ¶ 56; 21 ¶¶ 63, 67; 22 ¶ 69; 24 ¶ 76; 38 ¶ 119.

In January 2019, Plaintiff met with Hibbert to discuss his reentry to the SRT. ECF 19, at 18 ¶ 55. While Plaintiff notes that Hibbert was "comfortable" with Plaintiff rejoining the team, Hibbert indicated that he first needed to meet with Grob. *Id.* Hibbert later testified that Grob "insisted on not allowing Plaintiff back on the SRT allegedly due to his conduct in April 2018, and [] Hibbert did not overrule him." *Id.* In February, Grob emailed Plaintiff, copying Hibbert and Laserna, and stated that he had spoken with Hibbert "about Plaintiff's return to the SRT, denied his reinstatement to the SRT, and alleged that his removal was for cause and was permanent." *Id.* at 19 ¶ 58. Plaintiff says that at this time he began to suspect that "Hibbert's actions and inaction concerning [Plaintiff's] removal from, and denied reinstatement to, the SRT, might be due to discrimination." *Id.*

Plaintiff responded to Grob's email on March 7, 2019 and "articulated allegations of prejudice, harassment, and discrimination based on his race (Latino), national origin (Puerto Rican), and age, and stated that he would escalate the 'disputed situation and discrimination . . . to a higher level.'" ECF 19, at 19 ¶ 59. He detailed the past derogatory comments, operational disputes, and leadership denials, citing relevant DEA policies that he believed supported his

conduct during the April 18, 2018 operation. *Id.* at 19–20 ¶ 59. On March 15, Plaintiff contacted the DEA's Equal Employment Opportunity ("EEO") office. *Id.* at 20 ¶ 60. When a new Assistant Special Agent in Charge ("ASAC"), Michael Rothermund, joined the SRT the next month, Plaintiff also spoke to Rothermund about his discrimination complaint. *Id.* ¶¶ 61–62. Plaintiff filed his formal EEO complaint on April 18, 2019. *Id.* at 21 ¶ 64.

In October 2019, Plaintiff received his yearly performance rating from Hibbert, who gave Plaintiff a score of "Excellent." ECF 19, at 23 ¶ 71. Plaintiff notes that this was lower than the "Outstanding" rating he had received in previous years and that the lowered rating was due in part to Hibbert assessing the "Resource Management" element of Plaintiff's job at only a "Successful" (or second lowest) rating. *Id.* Hibbert explained that Plaintiff received the "Successful" rating because Plaintiff "had contacted to DEA HQ Staff Coordinators" to request overtime pay for Plaintiff's subordinates and to report a staffing shortage, actions Plaintiff describes as "constant and expected" in his work. *Id.*

Following revisal of the SRT manual, Plaintiff again reached out to Hibbert to ask about rejoining the SRT. ECF 19, at 23–24 ¶¶ 72–75. Hibbert retired in November 2019. *Id.* at 24 ¶ 77. Plaintiff alleges that during Hibbert's retirement party, Hibbert mentioned that he had been named by Plaintiff in the EEO complaint and that he "was not happy about it." *Id.* In early 2020, Grob also left the WDO, transferring to the DEA's headquarters office. *Id.* at 25 ¶ 79.

Hibbert was replaced by ASAC Orville Green in February 2020. ECF 19, at 25 ¶ 80. The same month, Plaintiff both filed a request for an EEOC hearing and submitted his second SRT application to Greene and Rothermund. *Id.* ¶ 82. A few weeks later, Greene called Plaintiff to inform him that Jesse Fong, the then-Special Agent in Charge ("SAC") of the WDO, would approve Plaintiff's return to the SRT. *Id.* at 26 ¶ 83. However, shortly thereafter, Plaintiff heard

from a colleague that Laserna had spoken to other agents and said that if "Plaintiff was selected as the new SRT Coordinator, [] Laserna would leave the SRT and would ask about six other SRT members to also leave the team." *Id.* ¶ 84. At the same time, Plaintiff reports that Robert West, "a White, Asian Pacific Islander male from the United States much younger than Plaintiff" was also promoted to SSA, as Plaintiff had been in 2018, but, unlike Plaintiff, was "not told to step down temporarily [from the SRT] to focus on his new supervisory duties." *Id.* ¶ 95.

In June 2020, Plaintiff learned that a different SSA, Tyrone Guyse, had been selected as SRT coordinator, even though Plaintiff was more senior and Guyse apparently did not want the coordinator position. ECF 19, at 27–28 ¶ 90. Throughout the summer and fall of 2020, Plaintiff continued to seek reinstatement on the SRT but management repeatedly failed to respond or else excluded Plaintiff from communications. *See id.* at 26–28 ¶¶ 86–93. Plaintiff alleges that other SAs were treated differently, with their applications handled more efficiently. *Id.*

Plaintiff met with Guyse on August 27, 2020 to discuss a potential leadership role on the SRT and the coordinator position in particular. ECF 19, at 31 ¶ 102. Guyse told Plaintiff that it would "not be a good idea" for Plaintiff to be in a leadership role given the "tensions" on the SRT as a result of Plaintiff's EEO complaint. *Id.* Guyse affirmed that he "would not tolerate any discrimination or bigotry on the SRT" and asked Plaintiff how he felt about returning to the SRT after "everything that [had] happened." *Id.* Guyse told Plaintiff that Plaintiff would join the SRT "just as any other agent and then, with time, [] could move into a leadership role." *Id.* Following the conversation with Guyse, Plaintiff received a call from Greene, who told Plaintiff that he "would allow [Plaintiff] to return to the SRT but not in any leadership role" and that Greene would not change his mind "on the issue of a SRT leadership role for Plaintiff." *Id.* ¶ 103.

8

Greene repeated this position at a meeting on September 14, 2020. ECF 19, at 31 ¶ 104. Greene also told Plaintiff "that a large number of SRT members had resigned from the SRT because Plaintiff and another agent," apparently agent Fleury, "were scheduled to return to the team." *Id.* at 32 ¶ 104. Plaintiff "then told [] Greene that [] Lester had called him a 'Puerto Rican douchebag' in 2016, and that if anyone took negative action against him it would be retaliation because of his EEO case." *Id.* A few weeks later, a Senior Team Leader on the SRT, Beau Bilek, submitted a memorandum to Fong in which he stated "his concerns about Plaintiff returning to the SRT" based on Plaintiff's alleged "attitude of insubordination, unprofessionalism and hostility[.]" *Id.* ¶ 106. Bilek, along with thirteen other SRT members, submitted requests to Fong asking "to take leaves of absence from the SRT if Plaintiff returned to the SRT." *Id.* Plaintiff notes that all of these individuals were "White, Caucasian males and all were approximately 5-10 years younger than Plaintiff" save for two, who were around Plaintiff's age. *Id.* at 33 ¶ 106. Bilek later attempted to interfere with Plaintiff's reinstatement to the SRT by trying to limit the number of applicants who could be considered for appointment. *Id.* ¶ 108.

On December 2, 2020, Plaintiff met with Fong, Greene, and Rothermund. ECF 19, at 34 ¶ 110. Fong told Plaintiff he was denying Plaintiff's application to return to the SRT "because he was allegedly looking out for the best interests of the Agency, and because [fourteen] members of the WDO SRT submitted memoranda requesting a leave of absence from the SRT because Plaintiff was scheduled to return to the SRT." *Id.* Fong also "claimed that Plaintiff had been accused of being unprofessional and committing safety violations," but "did not offer any specifics." *Id.* Plaintiff denied the allegations. On December 17, Plaintiff emailed the other meeting attendees to give his recounting of the "highly improper" meeting and protest how management was "allowing a group of agents with a long history of bigotry, defamation, discrimination, retaliation, and

shenanigan[s] to represent the Washington Division SRT and the DEA" and to "conspire to keep [Plaintiff] of the SRT." *Id.* at 35 ¶ 111. Plaintiff detailed his experience of discrimination, including being called a "Puerto Rican douchebag" and having his accent mocked, and denied that he had been unprofessional or violated any protocol. *Id.* Plaintiff also requested Fong reconsider his decision denying Plaintiff a spot on the SRT. *Id.* Fong responded to affirm that he would not revisit his decision and that he would pass along Plaintiff's email alleging misconduct to the DEA's Office of Professional Responsibility. *Id.* at 36 ¶ 112. Plaintiff says that this "was the first time any Agency management official referred any of Plaintiff's allegations" to the Office of Professional Responsibility, despite Plaintiff's multiple reports of "harassment, discrimination, and retaliation." *Id.*

Fong retired at the end of 2020 and was replaced by Jared Forget. ECF 19, at 38 ¶ 116. Plaintiff indicated that he wanted to speak to Forget about the "long history of discrimination and retaliation involving some past and present members of the SRT" and to discuss the possibility of Plaintiff returning to the SRT. *Id.* Despite Plaintiff's interest in speaking to Forget, Forget "never agreed to meet or even speak with Plaintiff to discuss his return to the SRT." *Id.* at 39 ¶ 121.

On March 24, 2021, Plaintiff submitted a request to transfer to "the vacant GS position in the Airport Group in the WDO." ECF 19, at 39 ¶ 122. On March 26, Plaintiff learned that "SSA Victoria Webb, a Black, African American female who was much younger than Plaintiff, would be transferring from the Airport Group GS position to the Annandale, VA office via a lateral transfer[.]" *Id.* Thereafter, Plaintiff met with Greene for his midyear performance evaluation, during which time Plaintiff asked how "Webb, a new supervisor, could secure a transfer within the WDO, whereas Plaintiff—an experienced supervisor—could not secure a transfer despite repeated requests for one for two-and-a-half years." *Id.* at 39–40 ¶ 123. Greene told Plaintiff that

it was Forget's decision but that Greene would approve a transfer request to the Airport Group position and send it to Forget for consideration. *Id.* at 40 ¶ 123. Forget later denied Plaintiff's request without providing explanation. *Id.* ¶ 124. Subsequently, Plaintiff learned that "Angela Greene, ASAC Greene's wife—a White, Caucasian woman from the United States much younger than Plaintiff—had secured the Airport Group GS position that Plaintiff had been denied," despite not possessing the task force supervision experience that Plaintiff had. *Id.*

Meanwhile, Plaintiff's EEO complaint was still pending. He had moved to amend the complaint three times, with the final time occurring on June 7, 2021. ECF 19, at 40 ¶ 125. On July 21, the DEA's Office of Professional Responsibility "issued a Final Report on Plaintiff's of discrimination and retaliation." The report determined that "(1) [] Grob did not engaged in discrimination and retaliation; (2) [] Bilek did not engage in discrimination and retaliation; (3) [] Laserna inappropriately mocked Plaintiff's accent between late 2015 and early 2016; and (4) [] Lester called Plaintiff a 'Puerto Rican douchebag' in 2016." *Id.* at 41 ¶ 127.

Thereafter, Plaintiff and the DEA engaged in discovery before the EEOC Administrative Judge ("AJ"). Following a discovery dispute, the AJ "permitted the Agency to refuse to provide Plaintiff with responses to his interrogatories and requests for admission" but did allow limited additional discovery. ECF 19, at 41 ¶ 128. Plaintiff was permitted to conduct oral depositions of five DEA management officials or former officials (Hibbert, Rothermund, Greene, Fong, and Forget) while the DEA was required to "provide responses to Plaintiff's supplemental requests for production of documents" and both parties "were permitted to obtain sworn, written interrogatories of five additional witnesses who had not been interviewed during the EEO investigation[.]" *Id.* at 41–42 ¶ 128.

The DEA filed a motion for summary judgment on September 15, 2022. ECF 19, at 42 ¶ 129. The case was reassigned to a different AJ on October 14. *Id.* ¶ 130. On September 26, 2023, the AJ granted the DEA's motion for summary judgment and on October 31, the Complaint Adjudication Office of the Department of Justice issued a final order "accepting the EEOC AJ's Decision and Order in favor of the Agency." *Id.* ¶¶ 130–31.

Plaintiff alleges employment discrimination based on race in violation of Title VII (Count I); national origin discrimination in violation of Title VII (Count II); retaliation for protected EEO activity in violation of Title VII (Count III); a hostile work environment in violation of Title VII (Count IV); employment discrimination based on age in violation of the Age Discrimination in Employment Act ("ADEA") (Count V); retaliation for protected EEO activity in violation of the ADEA (Count VI); and hostile work environment in violation of the ADEA (Count VII). ECF 19, at 42–54 ¶¶ 133–80.

## II.    LEGAL STANDARD

When presented with a motion to dismiss or, in the alternative, a motion for summary judgement, the disposition of the motion "implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure." *Pevia v. Hogan*, 443 F. Supp. 3d 612, 625 (D. Md. 2020). "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

A motion to dismiss styled in the alternative as a motion for summary judgment implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011), *aff'd* 684 F.3d 462 (4th Cir. 2012). Conversion of a motion to dismiss to one for summary judgment under

Rule 12(d) is permissible where a plaintiff has notice that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). When a movant expressly captions its motion to dismiss "in the alternative" as one for summary judgment and submits matters outside the pleadings for the Court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the Court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261; *see also Willey v. Bd. of Educ. of St. Mary's Cnty.*, 557 F. Supp. 3d 645, 657 (D. Md. 2021) ("Notably, 'the Federal Rules do not prescribe that any particular notice be given before a Rule 12 motion is converted to a Rule 56 motion.'" (quoting *Ridgell v. Astrue*, Civ. No. DKC-10-3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012))).

Ordinarily, a party opposing the conversion of a motion to dismiss into one for summary judgment must submit a Rule 56(d) affidavit setting forth their reasons, and the Fourth Circuit places "great weight" on the necessity of such an affidavit. *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996). However, failure to file a Rule 56(d) affidavit does not necessarily doom a party's opposition to conversion, and a court may consider whether the nonmoving party has "adequately informed the [ ] court that the motion [for summary judgment] is [premature] and more discovery is necessary." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002). Nevertheless, a Rule 56(d) affidavit is inadequate if it merely asks for "discovery for the sake of discovery." *Hamilton v. Mayor of Balt.*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (internal citation omitted). Such a request is properly denied where "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006) (quoting *Strag v. Bd. of Trustees*, 55 F.3d 943, 954 (4th Cir. 1995)).

Here, Plaintiff has filed a Rule 56(d) affidavit indicating that further discovery is warranted. *See* ECF 34, at 60–61. He avers that "discovery could possibly create a genuine issue of material fact sufficient to survive summary judgment." *Id.* at 61. Plaintiff posits that such additional discovery would likely include "interrogatories and requests for admission for all key witnesses since such discovery was denied by the EEOC AJ" and additional depositions of key DEA employees such as Hibbert, Grob, Bilek, and Laserna, in consideration of numerous employees' retirement "prior to EEOC discovery" and delayed production of documents relating to the Office of Professional Responsibility investigation. *Id.*

Plaintiff's contention that further discovery "could possibly create" a genuine dispute of material fact comes close to asserting a need for "discovery for the sake of discovery." *Hamilton*, 807 F. Supp. 2d at 342. And while the AJ did set limits on discovery during the EEOC proceeding, the parties still had ample opportunity to obtain materially relevant information. Nevertheless, the Court credits that Plaintiff did not have the opportunity to receive "responses to his interrogatories and requests for admission." ECF 19, at 41 ¶ 128. Therefore, the Court will treat Defendant's motion as one to dismiss.

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

## III.    ANALYSIS

### A.    Time Bar

Defendant argues, as a threshold matter, that portions of some of Plaintiff's claims are time-barred. ECF 23, at 22 (arguing that "Claim 2" and the "portions of Claim Nos. 1 and 3 that occurred prior to January 29, 2019 are time-barred"). According to Defendant, 29 C.F.R. § 1614.105(a)(1) requires a complainant to "initiate contact with a[n] [EEO] counselor within 45 days of the date of the matter alleged to be discriminatory." Defendant argues that any claims of discrimination or retaliation based on the offensive remarks directed toward Plaintiff from 2016 to 2018, as well as Plaintiff's allegations that the DEA impeded his efforts to return to the SRT, are time-barred where they occurred before January 2019, 45 days before Plaintiff made contact with the DEA's EEO office on March 15, 2019. ECF 23, at 23. Plaintiff argues that the claims related to Defendant's alleged delay in reinstating him to the SRT are subject to equitable tolling until the date in February 2019 when he first suspected possible discrimination. ECF 34, at 52. Plaintiff also invokes the continuing violation theory in that the older claims dating back to 215 "evince[] a pattern of continuous discrimination that should not be fragmented in a manner that prejudices Plaintiff." *Id.*

"The Fourth Circuit has held that a federal employee's failure to consult with an EEO counselor within the required time after an alleged act of discrimination, i.e. within 45 days, is grounds for dismissing the employee's Title VII claim in federal court." *Blount v. Dep't of Health & Hum. Servs.*, 400 F. Supp. 2d 838, 841 (D. Md. 2004), *aff'd sub nom. Blount v. Thompson*, 122 F. App'x 64 (4th Cir. 2005) (internal citation omitted). Plaintiff himself alleges that the instances involving Laserna and Lester's mocking of his racial and national background occurred from 2016 to 2018. ECF 19, at 5 ¶ 17. Such past incidents are "relevant background evidence to any non-time-barred claims, which could establish discriminatory animus in a summary judgment motion, for instance." *Hagans v. Raimondo*, Civ. No. 23-1973-BAH, 2024 WL 2155022, at *4 (D. Md. May 13, 2024). Plus, such past incidents may also bolster claims of a hostile work environment, representing continuing violations for which actions outside the limitations period may be considered together so long as one act falls within the limitations period. *Nat'l R.R. Passenger Corp. v. Morgan*, 563 U.S. 101, 117 (2002) ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."). Here, Plaintiff has plausibly alleged that the mocking and derogatory remarks from 2016 onward form part of a pattern of hostility that continued through 2020, when his SRT reinstatement was denied and colleagues allegedly sought to frustrate his return. Nevertheless, as discrete acts supporting *individual* claims, such claims are time-barred. *Id.*

The Court finds that Plaintiff's claims relating to the allegedly discriminatory denials of his reinstatement on the SRT raised in March of 2019 are not, however, time barred. Plaintiff alleges that he first suspected a discriminatory intent behind the failure to reinstate him to the SRT

beginning in January and February 2019, within the 45-day window of when he contacted the EEO office in March of that same year. *See* ECF 19, at 18 ¶ 55, 19 ¶ 58, 20 ¶ 60. Thus, the allegation of discrimination based on the alleged failure to reinstate Plaintiff to the SRT following his request in January of 2019, *id.* at 19 ¶ 55, may support discrete claims of discrimination.

### B.    Discrimination on basis of race, national origin, and age (Counts I, II, and V)

#### 1.    Title VII

Plaintiff alleges that he was discriminated on the basis of his race (Latino) and national origin (Puerto Rico) in violation of Title VII.  He asserts that he was unlawfully discriminated against when other agents "made bigoted offensive comments to Plaintiff based on his race, mocked his accent, and took materially adverse employment actions" against him. ECF 19, at 43 ¶ 135 (alleging race-based discrimination); *see also id.* at 44 ¶ 141 (alleging national origin discrimination).  He alleges that he was subjected to discriminatory treatment that was "inferior to similarly situated [employees] who were not Latino" and that "[t]he Agency cannot provide a legitimate, nondiscriminatory reason for the disparate treatment that is not pretextual, as its criticisms of Plaintiff's conduct and performance, and other baseless and contradictory reasons, are lacking in evidentiary support[.]" *Id.* at 43 ¶ 136 (race); *see also id.* at 45 ¶ 142 (national origin).

Title VII provides that an employer may not "discriminate against any individual with respect to [] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  A plaintiff bringing a Title VII discrimination claim may "demonstrate through direct or circumstantial evidence that discrimination motivated the adverse employment action." *Rorie v. Bd. of Educ. of Charles Cnty.*, 653 F. Supp. 3d 217, 230 (D. Md. 2023); *see also Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (explaining that this first avenue of proof is established through

"ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue"). Under this approach, also known as the "mixed-motive framework," a plaintiff may succeed if they "'demonstrate[] that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice.'" *Ousley v. McDonald*, 648 F. App'x 346, 349 (4th Cir. 2016) (quoting *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 317 (4th Cir. 2005)). The evidence offered "must both display a discriminatory attitude and bear a causal relationship with the adverse employment action." *Id.* (internal citation omitted).

"A plaintiff pursuing a claim under Title VII may either offer direct evidence of discrimination or, using indirect evidence, she may rely on the burden shifting framework that was adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Coleman v. Whitley*, Civ. No. 21-1181, 2022 WL 16630570, at *1 (4th Cir. Nov. 2, 2022).[4] Under

---

[4] Though both parties appear to cite to the test articulated by the Supreme Court in *McDonnell Douglas* as the relevant framework for analyzing Plaintiff's claims, *see* ECF 23, at 25 and ECF 34, at 53–54, at least some of the allegations, particularly concerning the mocking of Plaintiff's accent and Lester's comment, appear to represent direct instances of discrimination. To the extent that Plaintiff does seek to bring claims based on direct evidence of discrimination, the Court determines that he may not do so. "The Fourth Circuit has held that comments proffered as direct evidence of discrimination must be made by a final decisionmaker involved in the alleged adverse employment action." *Hood-Wilson v. Bd. of Trs. of Cmty. Coll. of Balt. Cnty.*, Civ. No. 20-124-LKG, 2024 WL 4893641, at *6 (D. Md. Nov. 26, 2024) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 289 (4th Cir. 2004), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)); *see also Schafer v. Md. Dep't of Health & Mental Hygiene*, 359 F. App'x 385, 389 (4th Cir. 2009) (determining that the relevant question is whether "an actual decisionmaker used an improper criterion in making the employment decision"). Additionally, the Fourth Circuit has held that discriminatory statements that are "remote[] in time" to an adverse action are insufficient evidence of discrimination. *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511–12 (4th Cir. 1994). Here, Plaintiff does not allege that Lester decided any of the employment actions that Plaintiff challenges. And while Plaintiff does suggest that Laserna attempted to exert pressure on management to keep Plaintiff from rejoining the SRT, *see* ECF 19, at 26 ¶ 84, the gap in time between the incidents of Laserna's mocking Plaintiff's accent between 2016 and 2018 and Plaintiff's rejection from the SRT in 2020 are too remote to sustain a viable discrimination claim under the direct evidence theory.

the *McDonnell Douglas* proof scheme, a plaintiff must first establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *see also Diamond*, 416 F.3d at 318 ("The Supreme Court constructed the elements of the prima facie case to give plaintiffs who lack direct evidence a method for raising an inference of discrimination."). The burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. If such a reason is articulated, the burden then shifts again to a plaintiff to show that the employer's proffered reasons are pretextual. *Id.* at 804. The *McDonnell Douglas* test "is intended to be flexible, 'not onerous,' and is designed to uncover 'circumstances which give rise to an inference of unlawful discrimination.'" *Rodgers v. Eagle All.*, 586 F. Supp. 3d 398, 433 (D. Md. 2022) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

As the Supreme Court clarified in *Swierkiewwicz v. Sorema, N.A.*, the *McDonnell Douglas* burden shifting framework is an "evidentiary standard, not a pleading standard," and so is inapposite at the motion to dismiss stage. 534 U.S. 506, 510 (2002). However, *McDonnell Douglas* still remains useful as a framework for assessing whether a complaint accords with the standards articulated in *Twombly* and *Iqbal*. *Woods v. City of Greensboro*, 855 F.3d 639, 646–48 (4th Cir. 2017) (internal citations omitted). In other words, though a plaintiff need not establish a prima facie case at the motion to dismiss stage, "reference to the elements of a claim is helpful to assess whether the plaintiff has stated a plausible claim." *Allgaier v. Microbiologics, Inc.*, Civ. No. 22-01900-ELH, 2023 WL 2837336, at *8 (D. Md. Apr. 7, 2023).

A claimant can establish a prima facie case of racial discrimination under Title VII by showing: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse

employment action . . . . ; and (4) that similarly situated employees outside the protected class received more favorable treatment." *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004).

As a threshold matter, Defendant disputes Plaintiff's contention that the failure to reinstate Plaintiff to the SRT or the denial of his lateral transfer requests represents an "adverse employment action" sufficient to sustain Plaintiff's claim. *Coleman*, 626 F.3d at 190. An adverse employment action is one that "adversely affect[ed] the terms, conditions or benefits of [Plaintiff's] employment." *Perkins v. Intl. Paper Co.*, 936 F.3d 196, 207 (4th Cir. 2019). Defendant contends that SRT membership was merely a "collateral duty, as opposed to Plaintiff's primary duty, so Plaintiff did not experience any loss in pay or rank when he stepped away from the SRT." ECF 23, at 24. According to Defendant, this analysis conforms to the more expansive definition of an "adverse employment action" established by the Supreme Court in *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024).

The Court disagrees. In *Muldrow*, the Supreme Court found that a Title VII plaintiff need not show "significant employment disadvantage" to prevail but only "some injury respecting her employment terms or conditions." 601 U.S. at 359. This can encompass loss of a "prestigious" title or role in the workplace. *Id.* That is exactly what Plaintiff has alleged here, that he lost the opportunity to participate in a role, however "collateral," that he and others saw as "prestigious and integral to his standing within the DEA[.]" ECF 19, at 3 ¶ 12. Moreover, Plaintiff has alleged that participation in the SRT was "important for developing and maintaining his tactical skills and decision-making prowess," elements of his work that were important across multiple roles. *Id.* And the Court is likewise unconvinced that Plaintiff's acquiescence to removal from the SRT was truly "voluntary" where he thought it represented instead a brief pause of six months and attempted

20

to confirm as much with his superiors. *Id.* at 14 ¶ 43. Accordingly, the Court is satisfied that Plaintiff has sufficiently alleged an adverse employment action with respect to SRT reinstatement.

Additionally, Plaintiff's amended complaint contains facts sufficient to satisfy the remaining elements of a prima facie case of discrimination. He has pleaded membership in protected racial and national origin classes, *see* ECF 19, at 3 ¶ 8; satisfactory job performance, *see, e.g., id.* at 23 ¶ 71, 39 ¶ 123; and unfavorable treatment compared to employees outside the protected class, *see, e.g., id.* at 26 ¶ 85, 30 ¶ 101. As such, he has adequately pleaded a claim for discrimination on the basis of his race and national origin.

### 2.    ADEA

The ADEA makes it unlawful for an employer "to fail or refuse to hire . . . any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "An employee who alleges that [his] employer violated this prohibition 'must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision.'" *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)). The *McDonnell Douglas* framework applies to claims alleging age discrimination in violation of the ADEA as well as claims under Title VII.[5] To establish a prima facie case of age discrimination, a plaintiff must demonstrate that:

> (1) he was a member of a protected class, i.e., that he was at least 40 years old; (2) his employer had an open position for which he applied and was qualified; (3) he

---

[5] As noted above, "an employment discrimination plaintiff need not plead a prima facie case of discrimination" under *McDonnell Douglas* to survive a motion to dismiss made pursuant to Rule 12(b)(6). *Swierkiewicz*, 534 U.S. at 515. However, "reference to the elements" of a prima facie discrimination claim "is helpful to gauge the sufficiency of the allegations." *Gaines v. Balt. Police Dep't*, 657 F. Supp. 3d 708, 734 (D. Md. 2023).

was rejected despite his qualifications; and (4) the position remained open or was filled by a similarly qualified applicant who was substantially younger than the plaintiff, whether within or outside the class protected by the ADEA.

*Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (citing *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 310–12 (1996)).

For much the same reason as his race- and nationality-based discrimination claims, Plaintiff has also successfully stated a claim for discrimination on the basis of age. Plaintiff has alleged that he was a member of the protected class, and the oldest member of the SRT at 49. *See* ECF 19, at 8 ¶ 28. He alleges he was qualified for not only membership but leadership in the SRT and yet was rejected despite those qualifications. *Id.* at 27 ¶ 90. He also alleges that younger, similarly qualified members of the WDO were selected for SRT membership where Plaintiff was not. *Id.* at 29 ¶ 94. The same is true for Plaintiff's claims stemming from the denied lateral transfers. *Id.* at 39 ¶ 123. Plaintiff has therefore stated a claim for age discrimination under the ADEA.[6]

### C.    Retaliation for protected activity (Counts III and VI)

#### 1.    Title VII

"Title VII [] bars retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for participation in a Title VII investigation or proceeding." *Angelini v. Balt. Police Dep't*, 464 F. Supp. 3d 756, 776 (2020) (citing 42 U.S.C. § 2000e-3). "A Title VII retaliation claim may be established through direct evidence of retaliatory intent" or through a burden-shifting framework. *Eller v. Prince George's Cnty. Pub. Schs.*, 580 F. Supp. 3d 154, 178 (D. Md. 2022). Under this framework,

---

[6] While the ADEA, unlike Title VII, requires that a plaintiff show that their age was the "but for" cause of the alleged adverse employment action, they need not do so at the motion to dismiss stage and instead must only plausibly allege that they were discriminated against on the basis of their age. *Washington v. Balt. City Police Dep't*, Civ. No. 22-2212-LKG, 2023 WL 6308090, at *4 (D. Md. Sept. 28, 2023).

[A] plaintiff bears the initial burden of establishing a prima facie case of retaliation. Once this burden is carried, the burden shifts to the defendant, who is obliged to articulate a legitimate, non-retaliatory justification for the adverse employment action. If the defendant carries this burden, the onus is on the plaintiff to then demonstrate that the non-retaliatory reason advanced by the defendant is a mere pretext.

*EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). "A prima facie case of retaliation requires proof that: (1) the plaintiff engaged in protected activity, (2) [they] suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action." *Ray v. Int'l Paper Co.*, 909 F.3d 661, 669 (4th Cir. 2018) (citing *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015)).

Plaintiff has alleged elements sufficient to state a claim for retaliation. He has averred that he first contacted the EEO office in March 2019 and filed a formal EEO complaint the following month. ECF 19, at 20 ¶ 60, 21 ¶ 64. He has also alleged that his supervisors and colleagues were aware of his activity. *See, e.g., id.* at 19–20 ¶¶ 59–61. He has further alleged that following the filing of his complaint, he was subjected to various adverse employment actions, such as failure to be reinstated on the SRT and denials of his requests for a lateral transfer. *See, e.g., id.* at 21–22 ¶¶ 67–69; 34–36 ¶¶ 110–112. Notably, Plaintiff has alleged that he was told that Hibbert, one of Plaintiff's supervisors, had said he was "not happy" about having been named by Plaintiff in the EEO complaint, *id.* at 24 ¶ 78, and that Plaintiff was told it would "not be a good idea for [Plaintiff] to be in a leadership role on the SRT because of the 'tensions' on the SRT due to Plaintiff's EEO complaint," *id.* at 31 ¶ 102. At the motion to dismiss stage, "very little evidence of a causal connection is required to establish a prima facie case of retaliation." *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012) (cleaned up) (internal citation omitted); *id.* ("[T]emporal proximity between the protected activity and the employer's adverse action *alone* will suffice[.]" (emphasis

added)). At this stage, therefore, the Court is satisfied that Plaintiff has met his burden. The remaining elements being satisfied, the Court finds this is sufficient to state a claim for retaliation.

Though Defendant attempts to argue that Plaintiff cannot show retaliation because his requests to rejoin the SRT or to transfer were denied *prior* to filing his EEO complaint, *see* ECF 23, at 29, Defendant overlooks the fact that Plaintiff's primary contention is that the refusals to reinstate and transfer him *after* he engaged in protected activity were retaliatory, *see, e.g.*, ECF 19, at 34–36 ¶¶ 110–112. As the Supreme Court has explained, "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice." *Nat'l R.R. Passenger Corp.*, 563 U.S. at 114. Here, Plaintiff is alleging discrete acts of retaliation occurring subsequent to the filing of his EEO complaint.

### 2. ADEA

As with Title VII, the ADEA permits suits for retaliation for protected activity, using the same standard as applied to Title VII retaliation claims. *Baqir v. Principi*, 434 F.3d 733, 747 n.1 (4th Cir. 2006), *abrogated in part on other grounds by Gross*, 557 U.S. As ADEA retaliation claims mirror Title VII retaliation claims, the Court concludes that Plaintiff has sufficiently stated a claim for retaliation under the ADEA.

### D. Hostile work environment (Counts IV and VII)

#### 1. Title VII

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 272 (4th Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "Hostile environment claims are different in kind from discrete acts. . . . Such claims are based on the cumulative effect of individual acts." *Nat'l R.R. Passenger Corp.*, 536

U.S. at 115. Under both Title VII and § 1981, the elements of a hostile workplace claim are the same: a plaintiff must allege "(1) unwelcome conduct; (2) that is based on the plaintiff's race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto*, 786 F.3d at 277.

The Fourth Circuit has set "a high bar in order to satisfy the severe or pervasive test." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). "[T]o plead that the environment is sufficiently severe or pervasive, a plaintiff must allege an objectively hostile workplace environment as well as that it was subjectively perceived by the plaintiff as hostile." *Milo v. CyberCore Techs., LLC*, Civ. No. 18-3145-RDB, 2019 WL 4447400, at *6 (D. Md. Sept. 17, 2019) (citing *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 178 (4th Cir. 2001)). The determination of whether an environment is objectively hostile requires consideration of the "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* "Although the severity or pervasiveness of harassment can be a question of fact, a district court may dismiss a complaint that does not allege facts suggesting that the defendant's conduct was sufficiently severe or pervasive to alter the conditions of plaintiff's employment." *Sunkins v. Hampton Roads Connector Partners*, 701 F. Supp. 3d 342, 352 (E.D. Va. 2023) (collecting cases).

Plaintiff grounds his claim of a hostile work environment in the "racist, bigoted, and retaliatory comments" directed to him, specifically mocking his accent and his national origin. ECF 19, at 48 ¶ 156. He also alleges that the "materially adverse employment actions" he details contributed to the "hostile and abusive" nature of the workplace. *Id.* Plaintiff has plausibly alleged

25

that he was subjected to a hostile work environment based on his race and national origin: Plaintiff's colleagues repeatedly mocked his Puerto Rican/Spanish accent in front of other team members, and one agent openly called him a "Puerto Rican douchebag" during a training exercise. These incidents are squarely tied to Plaintiff's protected characteristics and go well beyond mere workplace friction. Indeed, the Fourth Circuit has recognized that even a single racial or ethnic slur can, if sufficiently severe, support a hostile work environment claim. *Boyer-Liberto*, 786 F.3d at 280–81. Here, the harassment was not only allegedly severe but also pervasive, occurring on multiple occasions over several years. Moreover, management was repeatedly informed of the conduct but allegedly failed to intervene, and in some cases supervisors themselves are alleged to have excluded Plaintiff from assignments and opportunities, reinforcing the environment of hostility. *See, e.g.*, ECF 19, at 36 ¶ 112. At the pleading stage, these allegations are sufficient to state a claim for a hostile work environment under Title VII.

### 2. ADEA

To establish a prima facie ADEA hostile work environment claim, a plaintiff must allege that the offending conduct was: "(1) unwelcome; (2) based on his age; (3) subjectively and objectively severe or pervasive enough to alter his conditions of employment and create an abusive atmosphere; and (4) imputable to the employer." *Cepada v. Bd. of Educ. of Balt. Cnty.*, 814 F. Supp. 2d 500, 513 (D. Md. 2011).

Unlike his claim of a hostile work environment under Title VII, Plaintiff's amended complaint contains fewer facts relevant to a hostile work environment under the ADEA. He does not, for example, allege that he was ever subjected to mocking treatment on the basis of his age. Instead, he has alleged unwelcome exclusion from the prestigious SRT assignment, with a duration of several years, which he ties to his status as the oldest team member. *See* ECF 19, at 53–54 ¶ 178. Plaintiff has not alleged facts sufficient to distinguish merely disparate treatment from

treatment that is objectively severe or pervasive. *Causey v. Balog*, 162 F.3d 795, 801–02 (4th Cir. 1998) (finding that a plaintiff failed to state an ADEA hostile work environment claim where he provided no evidence regarding "any derogatory comments about [his] age"). As such, the amended complaint fails to state a claim for a hostile work environment under the ADEA.

## IV.    **CONCLUSION**

For the foregoing reasons, Defendant's motion is granted in part and denied in part. The motion is granted as to Plaintiff's time-barred Title VII discrimination claims and ADEA hostile work environment claim (Count VII), and denied as to all other remaining claims.

A separate implementing Order will issue.

Dated: <u>August 28, 2025</u>                                    <u>           /s/           </u>
                                                                            Brendan A. Hurson
                                                                            United States District Judge